**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X

JOEL SPIGELMAN,

                Petitioner,

   - against -

UNITED STATES OF AMERICA

              Respondent.

------------------------------------------------------X

**OPINION AND ORDER**

**10 Civ. 7579  (SAS)**

**S3 05 CR 960 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/21/12

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

On July 20, 2007, a four-count Superseding Indictment, S3 05 CR 960, was filed charging petitioner, Joel Spigelman, with: (1) intentional murder in connection with a drug conspiracy;[1] (2) murder in aid of racketeering;[2] (3) murder committed with a firearm;[3] and (4) conspiracy to possess and distribute cocaine.[4] Spigelman's trial began on July 9, 2007, and ended on July 19, 2007, at which time the jury convicted him of all four counts. This Court sentenced Spigelman to four concurrent life sentences, which he is currently serving at USP Coleman in

---

[1]     *See* 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

[2]     *See* 18 U.S.C. § 1959(a)(1) and (2).

[3]     *See id.* § 924(j).

[4]     *See* 21 U.S.C. § 846.

Coleman, Florida.

On September 28, 2010, proceeding pro se, Spigelman filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255[5] ("Section 2255").[6] In his Petition, Spigelman raises the following grounds: (1) ineffective assistance of counsel; (2) defective S3 Indictment and improper venue; (3) knowing use of false evidence; (4) unreasonableness of life sentence; (5) insufficient evidence; (6) violation of the Double Jeopardy Clause; (7) impairment at trial; (8) error by the Second Circuit in deciding his appeal: (9) selective prosecution; and (10) multiple conspiracies. For the following reasons, Spigelman's Petition is denied in its entirety.

---

[5]   *See* Petition Under 28 USC § 2255 to Vacate, Set Aside or Correct a Sentence by a Person in Federal Custody (the "Petition").

[6]   Pursuant to a Court Order dated January 30, 2012, Spigelman was permitted to amend his original Section 2255 motion to the extent of submitting one memorandum of law and one affidavit of fact in support thereof. Spigelman opted to submit a single Affidavit of Facts in Support of Original § 2255 ("Affidavit"), which elaborates the claims he made in his original motion. To the extent that the Affidavit contains new claims, *e.g.*, Intentional Relinquishment or Abandonment of a Known Right (Plain Error), such claims are summarily denied as untimely and dismissed. *See Gibson v. Artus*, 407 Fed. App'x 517, 519 (2d Cir. 2010) ("In *Mayle v. Felix* [545 U.S. 644 (2005)], the Supreme Court limited claims in an amended petition to those that arose from the same core facts alleged in the original petition, not those related generally to petitioner's trial, conviction, or sentence.").

## II.    BACKGROUND

### A.    The Government's Case at Trial

At trial, the Government presented overwhelming evidence that Spigelman ordered the robbery and murder of a female drug courier who was transporting large amounts of cocaine (the "murder").  The evidence showed that on March 17, 1999, Spigelman was expecting the courier to deliver fifty kilograms of cocaine to his home in Queens and to have another one hundred and fifty kilograms of cocaine in the trunk of her car.  Spigelman directed an individual named Jose Hernando Rodriguez a/k/a "Porcelana" - the leader of a robbery crew with whom Spigelman regularly did business - to rob the woman of the one hundred and fifty kilograms of cocaine after she delivered the fifty kilograms to Spigelman.  As part of the plan, Spigelman told Porcelana to kill the woman so that the robbery could not be traced back to him.[7]  Members of Porcelana's crew and others subsequently followed the woman from Spigelman's house, kidnaped her from her car, stole her drugs, and killed her, shooting her once in the head.[8]

The Government's evidence at trial included the testimony of over a dozen witnesses, as well as Spigelman's confession on the day of his arrest.  The

---

[7]    *See* Trial Transcript ("Tr.") at 69-70, 112-113, 170-171, 253-254, 311-316, 678-681.

[8]    *See id.* at 133-137, 163-164, 330-332, 692.

witnesses included four individuals - Ricardo Castro-Cubillos ("Castro"),
Geovanney Cordova, Jose Ramos, and Richard Paul - who testified pursuant to
cooperation agreements with the Government. Castro was a member of the
Porcelana crew and had worked with Spigelman for years; he personally met with
Spigelman in connection with the murder and actually participated in the robbery.
Cordova and Ramos were members of another crew, the Restrepo Crew, that
helped commit the robbery and murder. Paul sold kilogram-quantities of cocaine
to Spigelman independent of both robbery crews. The testimony of the four
cooperating witnesses was corroborated by crime scene photographs, the medical
examiner's autopsy report and testimony, and papers recovered during a search of
Spigelman's home upon his arrest. The Government also presented testimony
from a witness who found the victim's body after she had been shot, the first police
officer to respond to the scene, and victims of related robberies that were
committed after the murder.

### 1.    The Racketeering Enterprise: The Porcelana Organization

In addition to selling jewelry from a booth in the Diamond District of
Manhattan, Spigelman also regularly conspired with a violent armed robbery crew
led by Porcelana (the "Porcelana Crew").[9]  Spigelman performed several roles in

---

[9]    *See id.* at 107, 283-284, 292-294, 296, 298-310.

connection with the Porcelana Crew.  First and foremost, Spigelman was a tipster, providing the Porcelana Crew with information about jewelers and drug dealers who had drugs, merchandise, and/or money they could steal.[10]  In return for those tips, Spigelman received an equal share of the robbery proceeds.[11]  Second, Spigelman served as a "fence" and drug dealer who purchased stolen jewelry and drugs from the Porcelana Crew for resale.[12]

Although Spigelman began working with the Porcelana Crew as early as 1995,[13] the core members of the Porcelana Crew, who robbed and murdered the female drug courier, began working together in approximately 1997.[14]  From 1997 through 1999, the Porcelana Crew committed between twenty and thirty successful armed robberies.[15]

_____

[10]    *See id.* at 294, 298-310.

[11]    *See id.* at 301-302, 308.

[12]    This included over three kilograms of stolen heroin that members of the Porcelana Crew delivered to Spigelman's jewelry booth in Manhattan.  *See id.* at 292-94.

[13]    *See id.* at  296.

[14]    *See id.* at 283-284.

[15]    *See id.* at 284.  At trial, Castro detailed several robberies that the Porcelana Crew committed or attempted to commit, including at least four specific robberies (prior to the murder) which were based on tips from Spigelman.  *See id.* at 298-310.

The Porcelana Crew generally targeted jewelers and drug dealers,[16] based primarily on inside information (tips) from tipsters like Spigelman, who knew the targets or had some connection to them.[17]  Once they received a tip, the Porcelana Crew conducted surveillance of the location and/or person to be robbed. This surveillance, which took as long as three weeks to complete, was needed to confirm the target's identity and determine an opportune moment to carry out the robbery.[18]

The Porcelana Crew used a consistent *modus operandi* in carrying out its robberies.  Members of the Porcelana Crew, most of whom were almost always armed during the robberies, used firearms to gain entrance to victims' residences and to force victims to reveal the locations of drugs, money, jewelry, and other valuables.[19]  The Porcelana Crew used violence and threats of violence to subdue their victims and obtain information.  During the course of robberies, victims were frequently tied up, restrained, threatened with guns, and beaten.[20]  In order to conceal their identities, Porcelana and other crew members wore hooded

---

[16]     *See id.* at 285, 288.

[17]     *See id.* at 285, 294.

[18]     *See id.* at 285.

[19]     *See id.* at 284-285, 299, 303.

[20]     *See id.* at 257, 291-292, 300-301.

sweatshirts and baseball caps.[21]

Between 1997 and 1999, the Porcelana Crew consisted of five core members: Porcelana, Castro a/k/a "Corbato," and individuals known as "Bobo," "Piper," and "Conejo."[22] Each member had a specific role to play.[23] Porcelana and Castro were the first members to rush inside of an apartment or house to be robbed, followed by Conejo.[24] Piper collected tips for the robbery crew while Bobo acted as look-out, waiting outside in a getaway car.[25] After successful robberies, the Porcelana Crew divided the proceeds and then sold the stolen jewelry and drugs through Spigelman and other fences and narcotics traffickers.[26] Each member of the crew, plus the tipster, received an equal share of the proceeds.[27]

### 2. The March 17, 1999 Robbery and Murder

#### a. The Tip

On the night of March 15, 1999, two days before the murder,

---

[21] *See id.* at 287.

[22] *See id.* at 283-284, 287-288.

[23] *See id.* at 286.

[24] *See id.* at 285-286, 290-292.

[25] *See id.* at 285-286, 288-289 .

[26] *See id.* at 292-294.

[27] *See id.* at 301-302, 308.

Spigelman met with Porcelana and Conejo to plan the murder of the female drug courier. At that meeting, Spigelman told Porcelana that he could follow the woman from Spigelman's house and rob her of the one hundred and fifty kilograms she had in the trunk of her car.[28] Spigelman told Porcelana that he would have to kill her so the robbery could never be traced back to him. Porcelana agreed to Spigelman's offer.[29]

### b. The Robbery

On the morning of March 17, 1999, members of the Porcelana Crew waited outside Spigelman's home in Queens for the woman to arrive with two hundred kilograms of cocaine.[30] When she arrived, Castro got out of his car and walked by as the woman handed a box of cocaine to Spigelman.[31] Castro confirmed that the woman had additional boxes of drugs in the trunk of her car and informed Porcelana of this fact.[32] As the woman drove away from Spigelman's

---

[28] The proceeds of the robbery were to be divided equally among Spigelman and members of the Porcelana Crew. *See id.* at 336.

[29] *See id.* at 69-70, 112-113, 170-171, 253-254, 311-316, 678-681.

[30] *See id.* at 319-320.

[31] *See id.* at 125-126, 321-323.

[32] *See id.* at 126, 323-324.

house, members of the Porcelana Crew followed her in several cars.[33]

At this point, Porcelana realized that he did not have a loaded gun with which to commit the robbery and murder.[34] Porcelana and Castro decided to call Alex Restrepo, the violent leader of the Restrepo Crew, to provide a loaded gun.[35] What Porcelana did not realize, however, was that the Restrepo Crew was already involved in this robbery. After Conejo and Porcelana first met with Spigelman and received the tip, Conejo secretly went to the Restrepo Crew and told them that they could steal fifty kilograms of cocaine from Spigelman after the courier delivered the drugs to him.[36] Consequently, when the woman arrived in front of Spigelman's house that morning, two different robbery crews were watching her every move.

The Restrepo Crew followed Spigelman, who was carrying the cocaine he received from the courier, from his house that morning but lost him as he arrived in Manhattan.[37] It was at that point that Restrepo received the call from

---

[33]     *See id.* at 127, 324.

[34]     *See id.* at 325.

[35]     *See id.* at 325-326. Although Porcelana did not often work with Restrepo, Conejo was a member of both the Porcelana Crew and the Restrepo Crew and had close ties to Restrepo. *See id.* at 66, 91, 112, 283.

[36]     *See id.* at 112-114, 678-682.

[37]     *See id.* at 127, 129-132, 687-689.

Porcelana asking him to join the robbery of the woman.[38]

The two robbery crews joined forces at a McDonald's restaurant on Queens Boulevard, where the Porcelana Crew was watching the woman.[39] As the woman left McDonald's, more than ten robbers in six different cars followed her.[40] On a street around the corner from the McDonald's, the two crews trapped the courier's car between two of their own. There, they forced her out of her car at gunpoint.[41] Restrepo and Cordova put the woman in the back of Conejo's van, and Castro got into the woman's car and drove it to Porcelana's house.[42] Upon arriving at Porcelana's house, Castro verified that the cocaine was in the car's trunk and called Porcelana to let him know.[43] Porcelana responded, "Okay, then wipe-out time."[44]

---

[38]     *See id.* at 131-132, 691-692.

[39]     *See id.* at 133-134, 328.

[40]     *See id.* at 135, 330.

[41]     *See id.* at 135-137, 330-332.

[42]     *See id.* at 137-139, 332-333.

[43]     *See id.* at 333-334.

[44]     *Id.* at 334.

### c. The Murder

Restrepo, Conejo, and Cordova drove the black van with the courier in the back while Porcelana and other crew members followed close behind in different cars.[45]  At a certain point, the convoy stopped on the side of the road, and Restrepo and Cordova told Conejo to get out of the van and ask Porcelana what they should do with the woman.[46]  Cordova watched Conejo get into the car parked directly behind the van and speak to Porcelana.[47]  After making a quick call, Porcelana looked up at the van and gave the signal to kill the woman by slicing his hand across his neck.[48]  The crew members drove back to the highway and Porcelana again gave the order to kill the courier, shouting: "There, right there."[49]  Restrepo then shot the woman in the back of her head, killing her instantly.[50]  The woman has never been identified.[51]

---

[45]     *See id.* at 139-140.

[46]     *See id.* at 140-141.

[47]     *See id.*

[48]     *See id.* at 141-142.

[49]     *Id.* at 163-164.

[50]     *See id.* at 164, 692.

[51]     *See id.* at 636-638.

### d.  Sharing of the Proceeds

After the murder, the Porcelana Crew met with Restrepo at Porcelana's house to split the proceeds of the robbery.[52]  Spigelman and each member of the Porcelana Crew received an equal share of the drugs.[53]  After some dispute, it was agreed that the Restrepo Crew would get two equal shares for Restrepo and his entire crew.[54]  Porcelana agreed to bring Spigelman his share of the drugs.[55]

### 3.  Spigelman's Arrest and Confession

On October 3, 2005, Spigelman was arrested in Florida in connection with the courier's murder.[56]  Spigelman agreed to speak with the arresting officers and agents of the Federal Bureau of Investigation ("FBI").[57]  After Spigelman was informed of his *Miranda* rights and signed a written waiver form, Spigelman told the agents that he "always felt this day would come" and said he would start with

---

[52]    *See id.* at 334-337.

[53]    *See id.* at  336.

[54]    *See id.*

[55]    *See id.* at  365.

[56]    *See id.* at 518, 560.

[57]    *See id.* at 536.

the "most serious thing" in which he had ever been involved.[58] Spigelman

proceeded to describe his role in the robbery and murder of the female drug

courier, admitting that he ordered the robbery and acknowledging that the woman

had been killed. Spigelman denied, however, that he ordered the murder.

After describing the robbery and murder of the female drug courier to

the FBI agents, Spigelman discussed various other robberies and drug deals in

which he had been involved, including: (1) giving tips to other robbers about his

jewelry customers;[59] (2) buying "millions and millions" of dollars worth of stolen

property;[60] and (3) setting up robberies of people he knew would have kilogram

quantities of drugs.[61] Although the interview was cut short due to time constraints

in the Florida court,[62] Spigelman drafted a written statement prior to the conclusion

of the interview that contained many of the details described above.[63]

---

[58]     *Id.* at 532-537.

[59]     *See id.* at 585-588.

[60]     *See id.* at 583.

[61]     *See id.* 583-585.

[62]     *See id.* 600-601.

[63]     *See id.* at 590-600. *See also* Government Exhibit 104.

## B.    The Defense Case

Spigelman testified that he had no personal knowledge of the courier's robbery or murder, notwithstanding the statements he made in his post-arrest confession.[64]  Spigelman claimed that he only knew those facts because Porcelana had called him sometime between 1999 and 2003 and told him about the crime.[65] Spigelman further testified that he had only confessed to the agents because they promised him that, if he confessed to his role in the murder, they would allow him to return home that evening for Rosh HaShanah dinner.[66]

## C.    Post-Trial Motions and Appeal

On August 21, 2007, my Chambers received a pro se submission from Spigelman entitled "Addendum-Back-Up Per Trial Transcript for Motion for Judgment of Acquittal Notwithstanding the Verdict or in the Alternative for New Trial Based on Newly Discovered Evidence" (the "Addendum").  In the Addendum, Spigelman cited numerous instances where his trial attorney, Frederick Cohn, allegedly provided ineffective assistance of counsel.  At a conference held on September 10, 2007, Cohn was relieved as counsel and in his place Marvin E.

---

[64]    *See* Tr. at 811.

[65]    *See id.* at 807-811, 885-886, 893.

[66]    *See id.* at 764-765, 811-812, 884-885.

14

Schechter was substituted as counsel. In advance of Spigelman's sentencing, Schechter submitted a letter brief dated December 3, 2007, which incorporated the points previously made in the Addendum. Schechter asked this Court to treat the Addendum as a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33") based upon the alleged ineffective assistance of Spigelman's former trial counsel (Cohn). I granted Schechter's request to treat the Addendum as a Rule 33 motion for a new trial but I denied the motion on the merits.[67]

Spigelman appealed his conviction on Count Three, murder through the use of a firearm (the "§ 924(j) charge"), to the Second Circuit. On appeal, Spigelman raised the following arguments: (1) this Court erred in denying his Rule 29 motion to dismiss the § 924(j) charge; (2) the *Pinkerton* jury instructions for the § 924(j) charge were erroneous; (3) there was insufficient evidence to convict as to the § 924(j) charge; and (4) the erroneous jury instructions on the § 924(j) charge created spillover prejudice with regard to Counts One and Two. By Order dated

---

[67]   *See United States v. Spigelman*, No. S3 05 CR 960, 2008 WL 84539, at *1, 4 (S.D.N.Y. Jan. 8, 2008). In addition, Spigelman's motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29") was implicitly denied when his motion for a new trial was denied.

April 10, 2009, the Second Circuit rejected Spigelman's appeal in its entirety.[68]

The Second Circuit affirmed the denial of Spigelman's Rule 29 motion, stating as follows: "In light of Spigelman's reasonable expectation of firearms being used in past crimes with which he was involved, a rational jury could well conclude that it was reasonably foreseeable to Spigelman that a firearm would be used in the crime for which he was tried."[69]  The Second Circuit also found that the *Pinkerton* jury charge on the § 924(j) count made it sufficiently clear to the jury that, to convict, the jury "had to find beyond a reasonable doubt that it was reasonably foreseeable to Spigelman that a firearm [was] used in the charged murder."[70]  Spigelman then filed for a *writ of certiorari* to the United States Supreme Court, which was denied on October 5, 2009.[71]

---

[68]     *See United States v. Rodriguez*, 320 Fed. App'x 105, 107 (2d Cir. 2009) (rejecting Spigelman's two main challenges and finding his remaining arguments to be without merit).

[69]     *Id.*

[70]     *Id.* ("Because the jury was also charged on the elements of the substantive crime, including the firearm element, it was perfectly clear to the jury that in order to convict Spigelman on a *Pinkerton* theory it had to conclude the firearm element was reasonably foreseeable to Spigelman.").

[71]     *See Spigelman v. United States*, 130 S. Ct. 258 (2009).

## III.  LEGAL STANDARDS

### A.  Section 2255

Section 2255 permits a convicted person held in federal custody to petition the sentencing court to vacate, set aside, or correct a sentence.  A properly filed motion under Section 2255 must allege that: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court was without jurisdiction to impose a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack.[72]  Accordingly, collateral relief under Section 2255 is permitted "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"[73]

### B.  Procedural Bar

It is well-settled that federal prisoners may not employ Section 2255 as a substitute for direct appeal.[74]  Generally, "claims not raised on direct appeal

---

[72]    *See* 28 U.S.C. § 2255.

[73]    *Cuoco v. United States*, 208 F.3d 27, 29 (2d Cir. 2000) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

[74]    *See, e.g., United States v. Frady*, 456 U.S. 152, 165 (1982); *United States v. Addonizio*, 442 U.S. 178, 184-85 (1979); *Hill*, 368 U.S. at 428-29.

17

may not be raised on collateral review unless the petitioner shows cause and prejudice."[75]  Furthermore, to the extent that a habeas petitioner brings claims that were litigated on direct appeal, the petitioner is procedurally barred from raising such claims again in a Section 2255 proceeding.[76]  "The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments."[77]

Under the "cause and prejudice" standard, the petitioner bears the burden of showing "cause for failing to raise [the claim on direct appeal] and prejudice therefrom."[78]  The Supreme Court has emphasized that "cause" is

---

[75]     *Massaro v. United States*, 538 U.S. 500, 504 (2003) (carving out an exception for ineffective assistance of counsel claims "which may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal").  *Accord Yick Man Mui v. United States*, 614 F.3d 50, 54 (2d Cir. 2010) ("A second rule that applies in the Section 2255 context prevents claims that could have been brought on directed appeal from being raised on collateral review absent cause and prejudice.").

[76]     *See, e.g., Yick Man Mui*, 614 F.3d at 53 (stating that "the so-called mandate rule bars re-litigation of issues already decided on direct appeal"); *Burrell v. United States*, 467 F.3d 160, 165 (2d Cir. 2006); *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (per curiam) ("It is well-established that a § 2255 petition cannot be used to 'relitigate [issues] which were raised and considered on direct appeal.") (quotation marks and citation omitted).

[77]     *Massaro*, 538 U.S. at 504.

[78]     *McCleskey v. Zant*, 499 U.S. 467, 494 (1991).

measured by a stringent standard of diligence.[79]  Thus, "[a]ttorney error short of

ineffective assistance of counsel . . . does not constitute cause and will not excuse a

procedural default."[80]  Furthermore, the prejudice prong requires far more than the

demonstration of a "possibility of prejudice."[81]  Instead, the prejudice must work to

the defendant's "actual and substantial disadvantage, infecting [the] entire trial

with error of constitutional dimensions."[82]

### C. Ineffective Assistance of Counsel

A petitioner seeking to attack his sentence based on ineffective

assistance of counsel must: (1) show that counsel's performance fell below "an

objective standard of reasonableness" under "prevailing professional norms," and

(2) "affirmatively prove prejudice," namely, demonstrate that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."[83]

---

[79]    *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (stating that "cause" is "something external to the petitioner" that "cannot be fairly attributed to him").

[80]    *McCleskey*, 499 U.S. at 494.  *Accord Coleman*, 501 U.S. at 753-54.

[81]    *Frady*, 456 U.S. at 170.

[82]    *Id.*

[83]    *Strickland v. Washington*, 466 U.S. 668, 693–94 (1984).

When analyzing a claim that counsel's performance did not meet constitutional standards, "judicial scrutiny of counsel's performance must be highly deferential."[84] The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[85] "In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices."[86] Constitutionally inadequate performance may be established if a habeas petitioner "shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."[87] Nonetheless, "[t]he failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which [a][p]etitioner [i]s entitled."[88] Finally, even if an attorney's performance was objectively unreasonable and unprofessional, a

---

[84] *Id.* at 689.

[85] *Id.*

[86] *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Stickland*, 466 U.S. at 690).

[87] *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000).

[88] *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (quotation marks and citations omitted).

petitioner must still prove prejudice.[89]  As explained by the Supreme Court, the

order of analysis of the two *Strickland* prongs is at the discretion of the court:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.[90]

---

[89]     *See Stickland*, 466 U.S. at 687.

[90]     *Id.* at 697, 693 ("Even if a defendant shows that particular errors of counsel were unreasonable, . . . the defendant must show that they actually had an adverse effect on the defense. . . [and] there is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").  *Accord  Farrington v. Senkowski*, 214 F.3d 237, 242 (2d Cir. 2000) (stating that courts need not resolve the *Strickland* performance prong if the prejudice prong is more readily resolved).

### D. Sufficiency of the Evidence

"[A] defendant making an insufficiency claim bears a very heavy burden."[91]  A jury verdict must be upheld if "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[92]  In a close case, where "'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'"[93]

"[A] district court can enter a judgment of acquittal on the grounds of insufficient evidence only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."[94]  "[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court."[95]  The court must analyze

---

[91]     *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002).

[92]     *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).  *Accord United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002).

[93]     *Autuori*, 212 F.3d at 114 (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (brackets in original)).

[94]     *Reyes*, 302 F.3d at 52.

[95]     *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

22

the pieces of evidence "not in isolation but in conjunction,"[96] and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others."[97]  The deference accorded to the jury's verdict "is especially important when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel."[98]

## IV.    DISCUSSION

### A.    Ineffective Assistance of Counsel Claims[99]

---

[96]    *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994).

[97]    *Guadagna*, 183 F.3d at 130.  *Accord Reyes*, 302 F.3d at 53 (stating that the court "consider[s] the evidence as a whole").

[98]    *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992) (quotation marks and citation omitted).

[99]    Although Spigelman states that his appellate counsel also deprived him of effective counsel, *see* Affidavit at 6, he does not provide any details to support such a claim.  Without any supporting factual allegations, Spigelman's conclusory claim of ineffective assistance of appellate counsel can be summarily dismissed.  *See Smith v. Girdich*, No. 03-CV-5193, 2004 WL 1743946, at *3 (E.D.N.Y. Aug. 4, 2004) ("[Petitioner's] cursory claims that he was denied the right to a fair trial and of 'procedural error' are too vague to permit review.") (citing *Dory v. Commissioner of Corr.*, 865 F.2d 44, 45 (2d Cir. 1989) (habeas claims based on "vague, conclusory, or palpably incredible" allegations may be summarily dismissed)).  Accordingly, only those ineffective assistance claims concerning Spigelman's trial attorney will be addressed in this habeas proceeding.

Spigelman failed to raise the issue of ineffectiveness of his trial counsel on direct appeal even though he had a new attorney representing him on appeal. However, the Supreme Court has held that "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under [Section] 2255."[100] But Spigelman did make this claim in his Rule 33 motion, which this Court denied, rejecting all of the fifty objections Spigelman made to his trial attorney's conduct.[101]

Spigelman raises the following new ineffective assistance claims in his Petition: "counsel did not leave open lines of communication between counsel and the defendant;" counsel abandoned the defendant; and counsel failed to object to improper statements made by the prosecutor.[102] In his Affidavit, Spigelman raises the following additional claims: trial counsel did not prepare an adequate defense because he did not call expert witnesses; counsel was not authorized to

---

[100] *Massaro,* 538 U.S. at 509 (abrogating the Second Circuit's decision to the contrary in *Billy-Eko v. United States*, 8 F.3d 111 (2d Cir. 1993)).

[101] *See United States v. Spigelman*, No. S3 05 CR 960, 2008 WL 84539, at *1 n.4 (S.D.N.Y. Jan. 8, 2008) ("This Court has reviewed the Government's analysis [of all fifty substantive points] and is in full agreement with each and every one.").

[102] Petition at 5.

enter into a stipulation on Spigelman's behalf; counsel stipulated to facts not brought out in the jury trial; counsel violated Spigelman's Sixth Amendment right to confront witnesses; and counsel failed to cast doubt on Spigelman's guilt.[103]

With regard to *Strickland's* performance prong, I previously found that "Cohn's conduct fell well within the range of reasonable professional standards."[104] In any event, even if trial counsel did, in fact, commit errors such that his performance fell below "an objective standard of reasonableness [under] prevailing professional norms," [105] Spigelman cannot demonstrate that but for such errors, "the result of the proceeding would have been different."[106] In dismissing Spigelman's Rule 33 motion, I stated that "in light of the overwhelming evidence against him, Spigelman cannot demonstrate that he suffered prejudice[.]"[107] I explained further:

> The evidence at trial overwhelmingly established Spigelman's guilt and included: Spigelman's written and oral post-arrest confessions, the testimony of four co-conspirators (one of whom spoke directly with Spigelman concerning the murder plot), and physical

---

[103]    *See* Affidavit at 1-4.

[104]    *Spigelman*, 2008 WL 84539, at *2.

[105]    *Strickland*, 466 U.S. at 687-88.

[106]    *Id.* at 693-94.

[107]    *Spigelman*, 2008 WL 84539, at *2.

evidence of the murder. Accordingly, Spigelman's criticisms of his trial attorney's strategy are without legal effect. Significantly, Spigelman does not explain how his proposed additional lines of cross-examination would have altered the jury's verdict or what affect any additional evidence resulting from his proposed direct examination would have had on the outcome of the trial. Examining the trial record as a whole, it is clear that none of the alleged failures of trial counsel, either considered individually or collectively, were such that there is "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Indeed, it is quite clear that the errors alleged in this case, even if they had any merit, had no effect on the outcome of the trial. Spigelman has therefore failed to satisfy *Strickland's* prejudice prong.[108]

My previous finding of a lack of prejudice is not altered by anything in Spigelman's Petition or Affidavit. In his Affidavit, Spigelman argues that there is a "presumption of prejudice if an actual denial of counsel occurs during a critical stage of the trial."[109] However, there is only a presumption of prejudice when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."[110] For this exception to apply, the attorney's failure "must be complete."[111] In no way did Cohn's representation of Spigelman constitute a

---

[108]    *Id.* at *4 (quoting *Strickland*, 466 U.S. at 694).

[109]    Affidavit at 6.

[110]    *United States v. Cronic*, 466 U.S. 648, 659 (1984) (emphasis added).

[111]    *Bell v. Cone*, 535 U.S. 685, 697 (2002).

complete failure of the adversarial system. Without the presumption of prejudice, Spigelman must show actual prejudice to succeed on his ineffective assistance of counsel claims. Because he has failed to do so, these claims are dismissed in their entirety.

### B. Many of Spigelman's Claims Are Procedurally Barred

#### 1. Claims Already Decided on Appeal

In his direct appeal, Spigelman argued that the evidence was insufficient to convict him on Count Three (the § 924(j) charge). Because that claim has been fully litigated and rejected by the Second Circuit, he cannot now re-litigate the claim in this habeas proceeding. This claim is therefore dismissed.

#### 2. Claims that Could Have Been Raised on Appeal

Spigelman now raises several claims that he could have raised, but chose not to, in his direct appeal. Spigelman makes no effort to demonstrate any external cause that prevented him from raising these issues on direct appeal. Thus, he has not satisfied the stringent "cause and prejudice" test. Accordingly, the following claims are procedurally barred: (1) the S3 Indictment was defective and venue was improper; (2) the sentence was unreasonable; (3) the evidence was insufficient to prove Spigelman guilty of Counts One and Two; (4) Spigelman's conviction was a violation of the Double Jeopardy Clause; (5) the Government is

guilty of selective prosecution; (6) Spigelman was not fully competent at trial

because he was denied his twice daily shots of insulin; and (7) the proof at trial

showed two independent conspiracies, rather than the one conspiracy charged in

the S3 Indictment.[112]  Although these claims are procedurally barred and, hence,

not subject to review on collateral attack, the claims are utterly without merit for

the following reasons.

### C.    The Procedurally-Barred Claims Are Without Merit[113]

### 1.    Defective S3 Indictment and Improper Venue

Spigelman argues that the S3 Indictment was defective because he

was never arraigned on the S3 Indictment and because venue was improper in the

Southern District of New York.  *First*, this Court arraigned Spigelman on the S3

Indictment on the morning of trial.[114]  At the time, this Court asked whether

counsel had reviewed the Superseding Indictment with Spigelman and whether he

---

[112]    Spigelman's eighth habeas claim – that the Second Circuit erred in deciding his appeal – is not cognizable on habeas review as it does not present a constitutional violation.  The remedy for such a claim is a *writ of certiorari* which was denied in this case.  Spigelman's eighth habeas claim is therefore dismissed.

[113]    In an abundance of caution, the merits of these claims are discussed as an alternative ground for dismissal.

[114]    *See* Tr. at 2-3.

wanted the charges publicly read.[115]  Spigelman's counsel responded that he had

reviewed the S3 Indictment with Spigelman, that Spigelman pled "Not Guilty" and

waived its public reading.[116]  Spigelman was present during this discussion and

made no objection.[117]  Moreover, Spigelman raised this issue in his Rule 33 motion

and it was summarily rejected.

      *Second*, Spigelman argues that venue was improper because the

majorities of the robberies and the murder took place in Queens, New York, which

is in the Eastern District of New York.  While it is true that the majority of events

took place in Queens, venue was clearly established at trial because the following

events occurred in this district: (1) Spigelman took his share of the cocaine from

the murder victim to his office in Manhattan;[118] (2) after the murder, Spigelman

met with Porcelana and collected an additional share of the victim's cocaine at his

Manhattan office;[119] (3) after the female courier's murder, Corbato abandoned her

car in upper Manhattan.[120]  Thus, venue was proper in the Southern District of New

---

[115]    *See id.*

[116]    *See id.*

[117]    *See id.*

[118]    *See id.* at 127, 129-132, 546-548.

[119]    *See id.* at 580-581.

[120]    *See id.* at 365.

York.  Spigelman's defective indictment and improper venue claim is therefore dismissed.

### 2.    Government's Knowing Use of False Evidence

Spigelman claims that "[p]er US Attorney letter – the U.S. Attorney knew that its star gov't witness [Castro] lied on the stand and allowed a false document to be admitted into evidence at the defendant['s] trial."[121]  Elaborating in his Affidavit, Spigelman claims that Castro stated under oath, at trial, that he received a sentence of thirty-five years to life when, in fact, he received a sentence of ten years for two murders.[122]  In fact, the "US Attorney letter" referred to by Spigelman relates to the Government's late disclosure of additional *Giglio* material related to Castro.  Thus, Spigelman's allegation that this disclosure was an admission that a witness lied on the stand and a false document was admitted into evidence is simply not credible.

Furthermore, Spigelman suffered no prejudice from the Government's late disclosure of *Giglio* material.  By letter dated December 8, 2008, the Government informed defense counsel that it had recently learned, in connection with the November 2008 trial of Porcelana, that Castro committed domestic

---

[121]    Petition at 5.

[122]    *See* Affidavit at 9.

violence against several partners for many years prior to his incarceration in 2001.

The Government further stated that this information constituted *Giglio* material, which should have been provided to Spigelman prior to trial or at the conclusion of Castro's direct testimony. The production was made post-trial because the Government realized that this disclosure had not previously been made.

The Government further noted, however, that Castro provided this information to the Government before the Spigelman trial began. It was the Government's inadvertent error that this information was not previously provided to defense counsel. At Spigelman's trial, Castro testified at length about his criminal background, which included two murders, one of which he committed single-handedly by shooting a man at point-blank range in a public park in Queens. Castro further testified about numerous shoot-outs, hundreds of robberies (most of which involved weapons and violence), assaults, drug-dealing, and other violence.[123] Given the far more horrific crimes in which Castro was involved, Spigelman did not suffer any harm from the delayed disclosure of Castro's domestic violence. There was ample information to show that Castro was a violent man who regularly flouted the law prior to becoming a cooperator. Furthermore,

---

[123] *See, e.g.*, Tr. at 255-266.

Castro's domestic violence history had no relevance to his truth-telling at trial. Accordingly, Spigelman's claim that the Government knowingly used false testimony is dismissed.

### 3.      Unreasonableness of Sentence

Spigelman argues that his life sentence was unreasonable because another judge of this Court sentenced his co-defendant Porcelana to fifty years imprisonment in a separate case.  As noted earlier,[124] Spigelman waived his right to challenge his sentence by not raising this issue on appeal.[125]   In any event, Spigelman's sentence was procedurally and substantively reasonable for the following reasons.   Spiegelman faced different charges and different penalties than Porcelana because Porcelana was extradited from Colombia.  Porcelana was extradited on the condition that the United States Government would seek a term of years, not a life sentence, as the sentence for the crimes charged.  Unlike Porcelana, Spigelman faced the additional charge of murder in aid of racketeering in violation of 18 U.S.C. § 1959, a count that Porcelana could not be charged with because it carries a mandatory sentence of life in prison.

---

[124]      *See supra* Part IV.B.2.

[125]      *See, e.g., Bousley v. United States*, 523 U.S. 614, 622 (1998).

Nonetheless, both Spigelman and Porcelana received reasonable sentences given their roles in the charged murder. While it was Porcelana and his crew that actually executed the robbery and murder, with the help of Restrepo, it was Spigelman who came up with the original plan and recruited Porcelana. Indeed, Spigelman ordered Porcelana to have the woman killed.[126] If it were not for Spigelman, the courier would likely be alive today. Thus, there is no basis for Spigelman's claim that his sentence was unreasonable. Accordingly, this claim is dismissed.

### 4. Sufficiency of the Evidence

Next, Spigelman claims that the evidence was insufficient to convict him of Counts One and Two of the S3 Indictment.[127] However, the evidence at trial amply demonstrated that Spigelman was guilty of both counts. To sustain its burden of proof on Count One, murder in connection with a drug conspiracy, the Government must prove the following four elements beyond a reasonable doubt: (1) that the defendant is guilty of participating in a drug conspiracy; (2) that the drug conspiracy involved five kilograms and more of cocaine; (3) that while engaged in such drug conspiracy, the defendant either intentionally killed the

---

[126]    *See* Tr. at 69-70, 112-113, 170-171, 253-254, 311-316, 678-681.

[127]    A similar argument with regard to Count Three was raised on appeal and rejected by the Second Circuit. *See supra* Part IV.B.1.

person specified in the indictment or counseled, induced, procured, or caused the intentional killing of that person; and, (4) that the killing actually resulted from the defendant's actions.[128]

To sustain its burden of proof on Counts Two, murder in aid of racketeering, the Government must prove the following three elements beyond a reasonable doubt: (1) that there existed, as charged in the indictment, an enterprise engaged in racketeering activity; (2) that the defendant committed the crime alleged, namely, the murder of an unidentified woman; and (3) that the defendant committed the crime alleged for the purpose of receiving money or something of value from the enterprise.

There is no dispute that Spigelman conspired to distribute cocaine and to commit a Hobbs Act robbery. In fact, Spigelman confessed to participating in those crimes when he admitted in his post-arrest statement to ordering the robbery of the drug courier.[129] The Government offered overwhelming evidence that Spigelman ordered the murder of the drug courier in furtherance of those crimes. That evidence included the testimony of three cooperating witnesses, all of whom

---

[128]     *See United States v. Walker*, 142 F.3d 103, 113 (2d Cir. 1998).

[129]     *See* Tr. at 540-542, 597.

testified that the order for the murder came from Spigelman.[130]  This evidence was all the more powerful given that the cooperating witnesses belonged to two separate robbery crews and learned this information from separate sources.  Castro, for example, testified that Porcelana told his crew, in no uncertain terms, that Spigelman ordered the murder so that the robbery could never be traced back to him.[131]  Castro further testified that he met with Spigelman and the rest of the Porcelana Crew to discuss plans related to the robbery and murder.[132]  Because there can be no dispute as to whether Spigelman ordered the murder, the evidence was sufficient to convict Spigelman of Count One.

The evidence was also overwhelming with respect to the existence of a racketeering organization, namely,  the Porcelana Crew.  The Government offered evidence of  its ongoing organizational structure, its core personnel, and its common purpose, notably, armed robberies.[133]  Equally compelling evidence related to Spigelman's involvement with that enterprise as a tipster and purchaser of stolen goods and drugs.[134]   Finally, there was no question that Spigelman

---

[130]     *See id.* at 69 (Cordova); *id.* at 314 (Castro); *id.* at 679-680 (Ramos).

[131]     *See id.* at 314.

[132]     *See id.* at 317-318.

[133]      *See id.* at 283-294.

[134]     *See id.* at 292-310.

committed the charged robbery/murder for the purpose of receiving a share of the cocaine from the robbery. Thus, there is sufficient evidence with regard to Count Two. Spigelman's challenge to his convictions on Counts One and Two is therefore denied.

### 5. Double Jeopardy Clause

Spigelman also claims that his conviction was a violation of the Double Jeopardy clause of the Constitution because he claims he was convicted twice with regard to the cocaine he had stolen from the female drug courier.[135] It appears that Spigelman is objecting to the fact that he was convicted of murder in connection with a cocaine conspiracy (Count One), which involved some of the same drugs as charged in Count Four of the Indictment, which charged Spigelman with participating in a cocaine conspiracy from at least in or about March 1999 through in or about February 2002.

The Double Jeopardy Clause of the United States Constitution protects against three different scenarios: a second prosecution for the same offense after an acquittal for that offense; a second prosecution for the same offense after conviction for that offense; and multiple punishments for the same

---

[135]    *See* Petition at 5-A.

offense.[136]  An indictment that charges a single offense in separate counts when, in law and in fact, only one crime was committed, is multiplicitous.[137]  However, the Double Jeopardy Clause does not prohibit multiple punishments for the same conduct if it violates two distinct statutes.[138]

Here, each of the charges against Spigelman in the S3 Indictment charged a separate offense that necessarily involved different elements, even if the underlying facts were similar.  Indeed, the Government often brings charges under more than one criminal statute and under more than one theory of criminal liability.  Moreover, Spigelman did not receive multiple punishments for the same offense because his sentences were concurrent on each count of conviction.  Because there was no violation of the Double Jeopardy Clause, this claim is dismissed.

---

[136]    *See United States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003).

[137]    *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).  "Conversely, '"[a]n indictment is duplicitous if it joins two or more distinct crimes in a single count.'"  *United States v. Walsh*, 194 F.3d 37, 46 (2d Cir. 1999) (quoting *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992)).

[138]    *See United States v. Barton*, 647 F.2d 224, 235 (2d Cir. 1981) ("It is undisputed that a single transaction may give rise to liability for distinct offenses under separate statutes without violating the Double Jeopardy Clause.  This is true whether the offenses be substantive crimes . . . or crimes of conspiracy.").

### 6. Impairment at Trial

Spigelman next claims that he could not object to errors during his trial because his "body shut down due to a denial of twice daily injection of insulin."[139] Spigelman further claims this was done purposely to "make sure [he] could not object."[140] *First*, there is no factual basis for Spigelman's claims that he was purposely denied medication in order to prevent him from objecting at trial.

*Second*, Spigelman made similar arguments about his medical condition after his trial in a motion seeking relief under the Eighth Amendment. Spigelman claimed that "this Court has no excuse for the medical neglect I have suffered – which almost rates as reckless endangerment."[141] In a letter dated January 9, 2008, the Government responded to Spigelman's motions, and reported the following facts to the Court:

> In anticipation of Spigelman's original sentencing date, the Government sought an update from an attorney at the MCC New York, Elisa Mason, concerning Spigelman's medical condition. Mason reported on December 12, 2007 that she had reviewed his medical chart with a doctor at the facility. As has been reported to the Court on earlier occasions, Spigelman has been diagnosed with diabetes, high cholesterol, and potentially early stages of glaucoma. He

---

[139] Petition at 5-B.

[140] *Id.*

[141] 1/6/08 Letter from Spigelman to the Court.

is currently taking prescription medications to manage his cholesterol, he is taking prescription eye drops, and he receives insulin for his diabetes. According to Mason, the MCC also recently implemented a diabetic diet, which he has been receiving. Since September 2007, Mason noted that Spigelman has seen a doctor at least 3 times at the MCC, and that he was sent out to the New York Eye and Ear specialist for his glaucoma on October 31, 2007, with a follow up scheduled for 4 months from then. The doctor reported that his conditions are manageable, and in fact his serum glucose has improved since implementing the diabetic diet. Mason also pulled Spigelman's commissary records and reported that he purchases sodas, Hershey chocolate bars, honey buns, jolly ranchers, and other high sugar content foods.

I also observed Spigelman during trial, particularly during his own testimony. It was abundantly clear to me that Spigelman was fully aware of the circumstances and was able to object if any issues arose at trial. Accordingly, because there is no basis for Spigelman's conclusory allegations that he was denied medication or was in any way impaired during trial, this claim is dismissed.

### 7.    Selective Prosecution

Spigelman claims that he was the subject of selective prosecution because there was no evidence linking him to the Restrepo Crew or the order to kill the female drug courier.[142] Given the wealth of evidence detailed above proving that Spigelman was directly responsible for ordering the robbery and murder of the

---

[142]    *See* Petition at 5-B ("The defendant has no link to [the] Restrepo Crew or [to] the order to kill the woman.").

female drug courier, Spigelman's claim of selective prosecution is unsubstantiated and is denied.

## 8. Multiple Conspiracies

Finally, Spigelman claims that the S3 Indictment charged a single conspiracy but the proof at trial disclosed two independent conspiracies.[143] Spigelman offers no further facts or support for this argument. While it is true that there were two different robbery crews involved in the robbery/murder of the female drug courier (the Restrepo Crew and the Porcelana Crew), these two crews joined forces in order to execute the robbery and murder that Spigelman ordered. Here, the Government offered proof of one continuing robbery/murder conspiracy and the evidence was overwhelming that Spigelman directly participated in that crime.

To prove a single conspiracy, the Government need show only that the defendant "agreed to participate in what he knew to be a collective venture directed toward a common goal."[144] Such an agreement may be inferred from a defendant's participation in the alleged enterprise and consciousness of its general nature and

---

[143]     *See id.* at. 5-C.

[144]     *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) (quotation marks and citation omitted). *Accord United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004); *United States v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000).

extent.[145]  It is not necessary that all of the conspirators' goals were completely

congruent, so long as they agreed on the essential nature of the unlawful plan and

their goals were not at cross-purposes.[146]

Furthermore, a single conspiracy "may encompass members who

neither know one another's identities, nor specifically know of one another's

involvement."[147]  A single conspiracy may be found where there is "'mutual

dependence among the participants, a common aim or purpose or a permissible

inference from the nature and scope of the operation, that each actor was aware of

his part in a larger organization where others performed similar roles equally

important to the success of the venture.'"[148]

A "'single conspiracy is not transposed into a multiple one simply by

lapse of time, change in membership, or a shifting emphasis in its locale of

---

[145]    *See United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989);
*United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980).

[146]    *See Maldonado-Rivera*, 922 F.2d at 963.

[147]    *United States v. Sureff*, 15 F.3d 225, 230 (2d Cir. 1994).  *Accord
Vanwort*, 887 F.2d at 383 (member need not "'conspire directly with every other
member of it, or be aware of all acts committed in furtherance of the conspiracy, or
even know every other member'") (quoting *United States v. Rooney*, 866 F.2d 28,
32 (2d Cir. 1989)).

[148]    *United States v. Williams*, 205 F.3d 23, 33 (2d Cir. 2000) (quoting
*Vanwort*, 887 F.2d at 383).

operations.'"[149] Nor is a single conspiracy transformed into multiple conspiracies "merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance."[150] Nor are multiple conspiracies necessarily created by periodic inactivity on the part of the conspirators.[151]

Moreover, it is unnecessary for a particular defendant to have joined in all of the conspiracy's unlawful objectives; so long as the scope of the agreement made by at least two of the co-conspirators included all the objectives of the charged conspiracy, a single conspiracy exists, and the defendant's conviction will be upheld as long as the evidence is sufficient to show that he agreed to accomplish at least one of the criminal objectives.[152]

Here, even if Spigelman did not know about the Restrepo Crew's involvement in the murder, there is no question that the Restrepo Crew joined the

---

[149]    *Id.* (quoting *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir. 1979)). *Accord United States v. Aracri*, 968 F.2d 1512, 1522-23 (2d Cir. 1992) ("'The jury need not have concluded that the same people were involved throughout the entire period of the conspiracy in order to find one conspiracy.'") (quoting *United States v. Nersesian*, 824 F.2d 1294, 1303 (2d Cir. 1987)).

[150]    *Maldonado-Rivera*, 922 F.2d at 963.

[151]    *See Aracri*, 968 F.2d at 1522-23.

[152]    *See Berger*, 224 F.3d at 113.

same conspiracy to rob and murder the courier.  Accordingly, Spigelman's multiple conspiracy claim has no merit and is dismissed.

## V.    CONCLUSION

For the reasons stated above, Spigelman's habeas Petition is dismissed in its entirety.  The remaining issue is whether to grant a Certificate of Appealability ("COA").  For a COA to issue, a petitioner must make a "substantial showing of the denial of a constitutional right."[153]  A "substantial showing" does not require a petitioner to demonstrate that he would prevail on the merits, but merely that "reasonable jurists could debate whether . . .the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"[154]  Petitioner has made no such showing.  Accordingly, I decline to grant a Certificate of Appealability. The Clerk of the Court is directed to close both the civil and criminal cases [10 Civ. 7579, S3 05 CR 960].

---

[153]    28 U.S.C. § 2253(c)(2).

[154]    *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (quoting *Barefoot* v. *Estelle,* 463 U.S. 880, 893 and n.4 (1983)). *Accord Middleton* v. *Attorneys Gen. of the States of New York and Pennsylvania,* 396 F.3d 207, 209 (2d Cir. 2005) (denying COA where reasonable jurists could not debate whether the district court's dismissal of the petition was correct).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
            August 21, 2012

**- Appearances -**

**Petitioner (Pro Se):**

Joel Spigelman
# 57380-004
USP Coleman
P.O. Box 1033
Coleman, FL 33521

**For Respondent:**

Michael D. Maimin
Assistant United States Attorney
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2238